[No. 41969. En Banc. August 26, 1971.]

THE STATE OF WASHINGTON, *on the Relation of Robert E. Schillberg, Respondent,* v. CHARLES BARNETT *et al., Appellants.*

*Gerald R. Gates,* for appellants.

*Robert E. Schillberg, Prosecuting Attorney,* and *Allen J. Hendricks, Deputy,* for respondent.

SHARP, J.—This is an appeal by Charles Barnett, d/b/a Sports Center, and Jack Sherin, d/b/a Sherin's Restaurant, a/k/a Turf Cafe, from an order enjoining as a public nuisance their conducting or allowing gambling on their premises in violation of RCW 9.47.010[1], as follows:

> Every person who shall open, conduct, carry on or operate, whether as owner, manager, agent, dealer, clerk, or employee, and whether for hire or not, any gambling game or game of chance, played with cards, dice, or any other device, or any scheme or device whereby any money or property or any representative of either, may be bet, wagered or hazarded upon any chance, or any uncertain or contingent event, shall be a common gambler, and shall be punished by imprisonment in the state penitentiary for not more than five years.

The litigation was instituted in the Superior Court for Snohomish County as three separate actions against numerous individuals and organizations to restrain the conducting of certain activities, such as bingo, craps and twenty-one, in addition to the card games involved in the instant appeal. As to these activities, the trial court, after hearing the actions in a consolidated trial, held that bingo constitutes a lottery within the provisions of the lottery statute, RCW 9.59.010; and that the dice game of craps and the card game of twenty-one constitute gambling within the purview of RCW 9.47.010. Although some of the parties conducting such activities filed notice of appeal, they subsequently withdrew from the appeal and do not here challenge the

---

[1] RCW 9.47.010 is not effective after midnight, August 9, 1971, being expressly repealed and superseded by Engrossed House Bill No. 291 (Laws of 1971, ch. 280) passed by the Washington State Legislature on May 10, 1971, and signed by Governor Evans after vetoing certain portions.

trial court's holding as to those matters. The parties to this appeal challenge only the trial court's conclusion that the card games of nine card cinch rummy, auction pinochle, and low ball or low poker constitute unlawful gambling within the meaning of RCW 9.47.010.

The matter was tried to the court in large part upon stipulated facts. Defendant Charles Barnett stipulated that he has allowed on his premises the playing of low ball or low poker. Defendant Jack Sherin stipulated that he has allowed on his premises the playing of nine card cinch rummy and auction pinochle, as well as low ball or low poker. Besides stipulating as to the house rules of the games, both defendants further stipulated that they have provided floor space, tables, chairs, playing cards, chips, and a man to attend the needs of the players, in return for a set amount of money paid to them by each player for each hour played; that the players exchange money with the defendants for poker chips; that the games involve both consideration paid by each player and a prize to be won by one of the players; that the defendants have paid city license fees and taxes each year for the gaming aspect of their businesses; and, that they intend to continue the activities unless enjoined or ordered otherwise.

The only testimony adduced at trial was that of two witnesses concerning the element of chance involved in the games. The state's witness, a special agent of the Federal Bureau of Investigation employed in the FBI laboratory in Washington, D.C., testified as to the mathematical elements of chance and skill in the games, concluding essentially that chance is a determinative factor in all three games. The defendant Jack Sherin testified as to the elements of chance and skill in the games more from a psychological or humanistic point of view, concluding in essence that skilled players have a definite advantage, and will, over a period of time, win consistently over those less skilled. The trial court found that these activities constituted gambling within the statutory definition, and enjoined the same.

The defendants on appeal urge a singular assignment of

error: that the trial court erred in making conclusion of law 4, such being inconsistent with, and contrary to, finding of fact 17. The trial court's conclusion of law 4 reads as follows:

That RCW 9.47.010 et seq. is interpreted by this Court to mean that these card games played for a consideration, with a prize at stake, wherein there is some element of chance involved are gambling within the meaning of said statutes.

The trial court's finding of fact 17 reads as follows:

That the card games of Nine Card Cinch Rummy, Auction Pinochle, Low Ball or Low Poker are predominantly games of skill and that one who is skilled will win consistently.

This finding must, of course, be read with the court's other findings, including finding of fact 18, reading as follows:

That the card games of Nine Card Cinch Rummy, Auction Pinochle and Low Ball or Low Poker contain a substantial element of chance.

In support of this assignment, the defendants urge that where skill predominates, the activity is not gambling. In reaching this conclusion, defendants would have us interpret the words "gambling game" in the statute as synonymous with the words "game of chance." The defendants point to several cases from this and other jurisdictions, where the words "game of chance" were before the court and the predominate element test has been evolved. Simply stated, the test calls for a determination of whether or not skill predominates in a particular game. If it does, the activity may not be a game of chance. If skill is not predominate, and assuming the factors of consideration and prize are found, the activity may well be interpreted as a game of chance.

The fallacy in defendants' argument is that the cases they rely upon, applying the predominate element test, are lottery cases, rather than gambling cases. For example, in *D'Orio v. Jacobs*, 151 Wash. 297, 275 P. 563 (1929), the court examined an Advertoshare board game (involving

playing of checkers) and found that since skill was the predominate, if not the only, element involved, the game was not a lottery either within Rem. Comp. Stat. §§ 2464, 2465 and 2466 (presently RCW 9.59.010, .020, .030) prohibiting lotteries, or Rem. Comp. Stat. § 2472 (presently RCW 9.47.030) prohibiting possession of certain gambling devices such as slot machines. To the same effect, this court stated in *Sherwood & Roberts—Yakima, Inc. v. Leach*, 67 Wn.2d 630, 409 P.2d 160 (1965), at page 634: "Chance *within the lottery statute* is one which dominates over skill or judgment." (Italics ours.) The defendants also rely upon the case of *D'Orio v. Startup Candy Co.*, 71 Utah 410, 266 P. 1037 (1928), wherein the Utah Supreme Court stated that the same game (Advertoshare) does not violate that state's statutes or constitutional provisions prohibiting "lottery, game of chance, or gift enterprise." The Utah court was not confronted with an alleged violation of a gambling statute.

As the cases relied upon by defendants concern lotteries or games of chance, we are faced with the task of defining gambling games within the statute, which in turn requires us to determine whether the legislature intended the term "game of chance" to be synonymous with the term "gambling game" in RCW 9.47.010.

In *State ex rel. Evans v. Brotherhood of Friends*, 41 Wn.2d 133, 150, 247 P.2d 787 (1952), we examined our constitutional and statutory prohibitions against lotteries, and recognized the distinction between gambling games and lotteries. We quoted, with emphasis, language of the Oregon Supreme Court in *State v. Coats*, 158 Ore. 122, 74 P.2d 1102 (1938) as follows:

> "Three things are necessary to constitute a lottery, viz, prize, chance and consideration: . . . [citing cases] *If any substantial degree of skill or judgment is involved, it is not a lottery.* Of course, all forms of gambling involve prize, chance and consideration, *but not all forms of gambling are lotteries.* A lottery is a scheme or plan, as distinguished from a game where some substantial element of skill or judgment is involved. *Poker, when*

*played for money, is a gambling game but, since it in-volves a substantion [sic] amount of skill and judgment, it cannot reasonably be contended that it is a lottery. . . ."* (Italics ours.)

The courts generally are in accord with the above quoted statement of the Oregon Supreme Court, that "Poker, when played for money, is a gambling game . . ." Thus, it is stated in 38 Am. Jur. 2d *Gambling* § 37 (1968), that:

> Engaging in playing any game of cards in which money, property, or other thing of value is won or lost is generally considered to be gaming within the meaning of statutes prohibiting and penalizing gambling.

It is apparent from the legislative history of RCW 9.47.010 that the legislature did not intend the statutory terms "gambling game" and "game of chance" to be synonymous. The legislature formulated the wording of the present statute in 1909. Laws of 1909, ch. 249, § 217, p. 955, was based on Code of 1881, § 1253, an act "To Prevent and Punish Gambling" which provided in pertinent part:

> Each and every person who shall deal, or carry on or open or cause to be opened, or who shall conduct, either as owner, proprietor, employe, whether for hire or not, any game of faro, monte, roulette, rouge et noir, lansque-nette, rondo, vingt-un (or twenty-one), poker, draw poker, brag, bluff, thaw, tan, or any banking or other game played with cards, dice, or any other device, whether the same be played for money, checks, credits, or any other representative of value, shall be guilty of a misdemeanor . . .

A comparison of the present RCW 9.47.010 with its predecessor, Code of 1881, § 1253, indicates an updating of language and an abandonment of the seemingly hopeless task of attempting to prohibit gambling games and games of chance by reference to their common names. In *State v. Robey*, 74 Wash. 562, 564, 134 P. 174 (1913), this court noted that the second part of RCW 9.47.010 relating to schemes or devices was "no doubt used out of abundant caution to cover unusual forms of gambling." It seems equally apparent that the reference to both "gambling

game" and "game of chance" in the first part of RCW 9.47.010 was also used out of abundant caution to include, without enumeration of the names, various types of games played with cards, dice or any other device combining elements of skill and chance in varying degrees which would, under certain circumstances, amount to the conducting of gambling, but would not qualify as games of chance within the lottery statute. Furthermore, as a matter of general statutory construction, each word of a statute is to be accorded meaning. *State v. Lundquist*, 60 Wn.2d 397, 374 P.2d 246 (1962). Defendants' theory would have us read out of the statute the words "gambling game"—leaving the statutory intent the same as the lottery statute insofar as card and dice games are concerned.

The court's findings and conclusions are amply supported by the evidence. It is conceded that the elements of consideration and prize are present in the instant games. The expert testimony from a mathematical standpoint was that chance was *a*, if not *the*, determinative element in the outcome of these games. Defendant Jack Sherin testified that even the most skillful player would not have control over winning any individual hand, though he might naturally increase his chance of winning by playing young, inexperienced players. Moreover, while no means determinative, it is interesting to note that judicial pronouncements defining such card games as gambling coincide with the defendant's own characterization of the play and players involved. Defendant Jack Sherin testified in reference to the dealing of cards, as follows:

> The man that deals discloses often his ability to play cards merely by a certain—you might say, physical characteristics—a professional, experienced card player quite often has smooth hands, uncalloused, wears large diamonds; that is quite characteristic of the professional *gambler*.

(Italics ours.) Then in reference to the liberal card player, Mr. Sherin testified, as follows:

> The liberal is quite often what we refer to as "fighting the clock." You see, most men that walk into a licensed pub-

lic card room to play cards aren't necessarily there to make money. It's a form of entertainment. If they have an hour to kill, or the wife has gone shopping, or they have an hour before dinner, or a couple of hours after dinner, or a little time after a union meeting, they are fighting a clock, they have a certain amount of time, you know, to *gamble* in, and if you become consciously aware of this through conversation with them, you realize their time is running out.

(Italics ours.)

While *reliance* upon the chance element in the instant games may depend in some degree upon how evenly matched in skill the participants are, the trial court's finding that these games involve a substantial element of chance is sustained by the evidence. The element of chance in the instant card games satisfies the requisite element of chance for a gambling game within the statutory prohibition of RCW 9.47.010.

We therefore affirm the trial court.

HAMILTON, C.J., FINLEY, HUNTER, HALE, NEILL, STAFFORD, and WRIGHT, JJ., concur.