**COMMONWEALTH of Pennsylvania,
Appellant**

**v.**

**Diane Alice DENT, Appellee.**

**Commonwealth of Pennsylvania,
Appellant**

**v.**

**Walter Leroy Watkins, Appellee.**

Superior Court of Pennsylvania.

Argued Oct. 21, 2009.

Filed March 25, 2010.

---

Thomas E. Leipold, Assistant District Attorney, for Commonwealth, appellant.

Howard J. Bashman, Willow Grove, for appellee.

BEFORE: FORD ELLIOTT, P.J., FREEDBERG, and COLVILLE *, JJ.

OPINION BY FREEDBERG, J.:

¶ 1 The Commonwealth appeals from an order entered on January 14, 2009, by the Court of Common Pleas of Columbia County, which granted Appellees', Diane Dent and Walter Watkins, petition for a writ of *habeas corpus* and dismissed the criminal charges against them. We reverse and remand.

¶ 2 The relevant facts and procedural history of this matter are taken from the trial court's January 14, 2009 opinion. In September 2008, Appellees were charged with twenty (20) counts of violating 18 Pa. Cons.Stat. Ann. §§ 5513(a)(2), (a)(3), and (a)(4), relating to unlawful gambling. Appellees filed an omnibus pretrial motion including a motion for relief in the nature of *habeas corpus*. A hearing and argument occurred on December 15, 2008.

¶ 3 At the hearing, Pennsylvania State Police Trooper David Darrow testified that in July and August 2008, while undercover, he participated in games of Texas Hold 'Em Poker [1] in a garage under the control of Appellees. N.T. 12/15/08 at 4–5. Trooper Darrow stated that immediately prior to the start of the game, each player would approach Appellee Dent, who acted as the dealer, and pay money to obtain chips. *Id.* at 6. During the course of the game, the players placed bets worth $1.00 or $2.00 into the "pot" and at the conclusion of each game the winner would receive the pot. *Id.* at 10. The practice during the games was that the winner who received the "pot" would tip the dealer. *Id.* While there was no set amount, players were encouraged to tip appropriately and to tip a larger amount if they won a bigger "pot." *Id.*

¶ 4 The parties agreed that the three elements of gambling under Pennsylvania law are consideration, chance, and reward. *Id.* at 19. They further stipulated that

* Retired Senior Judge assigned to the Superior Court.

1. In Texas Hold 'Em Poker:
   each player is dealt two private cards face down. The cards are referred to as the *hole* cards. Now the initial betting round takes place. After that, three public cards (the *flop* ) is (sic) placed face up in the middle of the table. The second betting round follows. When the betting round has finished, another public card (the *turn* ), is placed alongside the flop. Next is the third betting round. After that, the final, fifth, public card (the *river* ) is turned up, followed by the final betting round. Each player still remaining in the pot now combines the public cards with her hole cards to obtain a five card poker hand. When doing so, it is possible to use one, both or none of the hole cards to obtain a five card poker hand. Naturally, the player now (at the *showdown* ) having the best poker hand wins the pot.
   Trial Court Opinion dated 1/14/09 p. 2 n. 2 (internal citations omitted) (emphasis in original).

elements one and three were present because, to participate in the game, the players had to wager money, and, if they won the game, they were rewarded with money. *Id.* at 20. The parties agreed that the controlling question for the trial court was whether the element of chance predominates over skill in the game of Texas Hold 'Em Poker. *Id.* at 21–22. On January 14, 2009, the trial court issued an opinion finding that, because skill predominated over chance, Texas Hold 'Em Poker is not unlawful gambling pursuant to 18 Pa. Cons. Stat. Ann. §§ 5513(a)(2), (a)(3), and (a)(4). Accordingly, the trial court granted the motion and dismissed the charges.

¶ 5 The Commonwealth filed a timely appeal. It was then ordered to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The Commonwealth filed its statement, and the trial court then issued an opinion, relying on its January 14, 2009 opinion

¶ 6 On appeal, the Commonwealth raises one issue for our review:

1. Whether the lower court committed an error of law in concluding that 'Texas Hold '[E]m' Poker is not unlawful gambling under the Pennsylvania Crimes Code?

Commonwealth's Brief at 3.

¶ 7 In the instant matter, where the facts are not in dispute, the determination of whether the Commonwealth has established a *prima facie* case is a question of law. *Commonwealth v. Marti*, 779 A.2d 1177, 1180 (Pa.Super.2001). Thus, our scope of review is limited to determining whether the trial court committed an error of law. *Id.*

¶ 8 Appellees were charged with violating 18 Pa. Cons.Stat. Ann. §§ 5513(a)(2), (a)(3), and (a)(4), which provide:

§ 5513. Gambling devices, gambling, etc.

(a) **Offense defined.**—A person is guilty of a misdemeanor of the first degree if he:

\* \* \*

(2) allows persons to collect and assemble for the purpose of unlawful gambling at any place under his control;

(3) solicits or invites any person to visit any unlawful gambling place for the purpose of gambling; or

(4) being the owner, tenant, lessee or occupant of any premises, knowingly permits or suffers the same, or any part thereof, to be used for the purpose of unlawful gambling.

The statute does not define "unlawful gambling."

¶ 9 Neither a statute nor case law specifically addresses the legality of Texas Hold 'Em Poker. To resolve this appeal, we must first determine whether Texas Hold 'Em Poker is gambling. If so, then we must decide whether it is "unlawful" as that term is used in § 5513.

¶ 10 There are three elements to gambling: consideration, chance, and reward. *Commonwealth v. Two Electronic Poker Game Machines*, 502 Pa. 186, 465 A.2d 973, 977 (1983). As noted, the parties agreed that both consideration and reward have been established by the Commonwealth's evidence.

¶ 11 Pennsylvania appellate courts have not definitively addressed the precise question of whether poker is a game of chance or a game of skill. In a 1983 forfeiture action, the Pennsylvania Supreme Court ruled in three cases under Section 5513 with respect to whether certain electronic game machines constituted "gambling devices *per se.*" *Two Electronic Poker Game Machines*, 465 A.2d at 975. In deciding that certain of the machines did constitute gambling devices *per se,* the

Supreme Court discussed the three elements of "gambling" and then set forth the "predominate-factor test," which holds that for a game to constitute gambling, it must be a game where chance predominates rather than skill. *Id.* at 977. The Supreme Court stated that, in making this determination, the court should determine the relative amount of chance and skill present in the game; and if the element of chance predominates, the game is a gambling game. *Id.* at 978. The Supreme Court concluded that the poker machines were gambling devices, stating:

> While appellee has demonstrated that some skill is involved in the playing of Electro–Sport, we believe that the element of chance predominates and the outcome is largely determined by chance. While skill, in the form of knowledge of probabilities, can improve a player's chances of winning and can maximize the size of the winnings, chance ultimately determines the outcome because chance determines the cards dealt and the cards from which one can draw—in short, a large random element is always present. That the skill involved in Electro–Sport is not the same skill which can indeed determine the outcome in a game of poker between human players can be appreciated when it is realized that holding, folding, bluffing and raising have no role to play in Electro–Sport poker. Skill can improve the outcome in Electro–Sport; it cannot determine it.

*Id.* at 978 (internal citations omitted).

¶ 12 In *Liquor Control Bd. v. Kehler*, 114 Pa.Cmwlth. 310, 538 A.2d 979 (1988), the Commonwealth Court reversed the finding of the trial court which had reversed a decision of the Liquor Control Board, which found a licensee in violation of the Liquor Code, Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. §§ 1–101–9–

902, for allowing gambling (a poker game) on his premises. In looking at the conjunction of Section 5513 of the Crimes Code and the Liquor Code, the Commonwealth Court stated:

> In the past when we have upheld sanctions against licensees for gambling on the premises, this Court has dealt with factual circumstances which clearly indicated that the particular gambling activity under consideration was a violation of the Crimes Code. While we are not prepared to hold and need not decide that poker playing is "unlawful gambling" under the Crimes Code, we now hold that the Board's burden in the instant case was only to prove that gambling was occurring and that that activity was sufficient cause for the Board's action. It need not prove that the Crimes Code was in fact violated.
>
> Our Court, in dealing with the term, had held that the three elements of gambling are consideration, chance and reward. We believe that poker playing on a licensed premises *is* gambling within that definition. Certainly all three elements ... are present in a poker game. In order to participate, one must "ante up" money; the winner is determined by the luck of the cards drawn (and a lot of bluffing); and the winner takes the "pot."

*Id.* at 981 (internal citations and footnotes omitted) (emphasis in original).

¶ 13 Courts in other jurisdictions have addressed the issue of what constitutes a game of chance versus a game of skill, both in the context of poker and other games. In an early case, the Court of Appeals of New York noted that the "prohibition and regulation of gambling in all forms and lotteries of every kind are unquestionably valid exercises of legislative power." *People ex rel. Ellison v. Lavin*, 179 N.Y. 164, 71 N.E. 753, 754 (1904). The

Court of Appeals went on to note the difficulties of distinguishing between games of chances and games of skill:

> Throwing dice is purely a game of chance, and chess is purely a game of skill. *But games of cards do not cease to be games of chance because they call for the exercise of skill by players,* nor do games of billiards cease to be games of skill because, at times, especially in the case of tyros, their result is determined by some unforeseen accident, usually called 'luck.'

*Id.* at 755 (emphasis added).

¶ 14 In a 1911 case, the Supreme Court of Missouri upheld the conviction of a man for unlawful gambling, finding that a room set up for the purpose of "games of chance for money, property, and poker chips," and the maintaining of gaming tables used for the purpose of playing poker fell within the state's unlawful gambling laws. *State v. Cannon,* 232 Mo. 205, 134 S.W. 513, 514–15 (1911).

¶ 15 In a 1919 case, the Supreme Court of Nevada granted a petition for a writ of *habeas corpus* to a man who had been convicted under the state's lottery laws for operating a "nickel-in-the-slot" machine parlor. *Ex Parte Pierotti,* 43 Nev. 243, 184 P. 209 (1919). While distinguishing the lottery from games of chance, the Supreme Court stated that it was "absurd" to find that card games were games of skill rather than games of chance, "[a]ny game played with cards in which the hand at cards depends on a dealing with the face down is a game of chance." *Id.* at 211.

¶ 16 In 1927, the Supreme Court of Oregon found sufficient evidence to sustain an indictment against two men accused of operating illegal Keno tables. *State v. Randall,* 121 Or. 545, 256 P. 393 (1927). Oregon State law prohibited playing or conducting of certain enumerated games of chance (including poker) and/or games of

chance played with dice, cards, or other devices for value. *Id.* at 393. The defendants argued that Keno was a game of skill rather than a game of chance and that therefore the prizes awarded to the winners were a reward for skill. *Id.* at 394. In holding that Keno was a game of chance, the Supreme Court stated:

> [Keno] was under every essential element as much a game of chance as faro, *poker,* or any other game played with cards or any gambling device. In all card games there is more or less an element of skill. Take, for instance, the great American game of poker; we have no doubt, if a couple of gamblers sat down to play this game against a couple of ministers, who presumably do not indulge in it, that the ministers would soon be destitute of "chips" and the gamblers' pile augment accordingly. It is true there is an element of chance in poker, and a very large element at that, there is an element of chance in faro or any other game played with cards, but in any of these there is also some element of skill.

*Id.* at 394 (emphasis added).

¶ 17 In 1928, the Supreme Court of Utah discussed the argument regarding games of chance versus games of skill in a case regarding a contract dispute over the sale of certain equipment used in gambling games. *D'Orio v. Startup Candy Co.,* 71 Utah 410, 266 P. 1037 (1928). The Court opined that card games that included dealing cards face down were games of chance because, "[i]f the card (sic) are fairly dealt, the most skillful player cannot tell in advance what kind of hand he will draw." *Id.* at 1039.

¶ 18 In 1935, the Supreme Court of Kansas held that the game of five-card stud poker was not a "confidence game" or "swindle" or "any such game" under a

statute intended to prohibit the dealing, playing, or practicing of "three-card monte." *State v. Terry*, 141 Kan. 922, 44 P.2d 258 (1935). The Supreme Court noted, however, that poker was a gambling game that was a combination of skill and chance. *Id.* at 259–60.

¶ 19 In a 1971 case, the Supreme Court of Washington ruled that the game of "low poker" constituted unlawful gambling under a statute prohibiting the conducting or allowing of gambling on premises. *State v. Barnett*, 79 Wash.2d 578, 488 P.2d 255 (1971). The Supreme Court stated that playing games of cards for money, property, or anything of value, constituted gambling within the meaning of statutes prohibiting or penalizing gambling. *Id.* The Court concluded:

> [W]hile reliance upon the chance element in the instant [card] games may depend in some degree upon how evenly matched in skill the participants are, the trial court's finding that these games involved a substantial element of chance is sustained by the evidence. The element of chance in the instant card games [including "low poker"] satisfies the requisite element of chance for a gambling game . . .

*Id.* at 258–59.

¶ 20 In a 1995 case, the Criminal Court of the City of New York refused to dismiss an indictment for possession of a gambling device, namely the equipment used in "the shell game." *People v. Turner*, 165 Misc.2d 222, 629 N.Y.S.2d 661 (N.Y.Crim. Ct.1995). In its decision, the court noted that the term "games of chances" was broadly defined, including games that required no skill, such as a lottery, to games like poker, which required considerable skill. *Id.* at 662. The court stated that, despite the fact that poker required skill, it was "as much [a game] of chance as [the lottery] since the outcome depends to a

material degree upon the random distribution of cards. The skill of the player may increase the odds in the player's favor, but cannot determine the outcome regardless of the degree of skill employed." *Id.* (citations omitted).

¶ 21 In a recent decision, the Court of Appeals of North Carolina affirmed a decision in a declaratory judgment action, which held that poker is a game of chance rather than a game of skill and, thus, is illegal under North Carolina law. *Joker Club, L.L.C. v. Hardin*, 183 N.C.App. 92, 643 S.E.2d 626 (2007). At trial, the plaintiff presented the testimony of four experts, a professional poker player, a consultant who ran poker tournaments, a casino manager, and an amateur player. *Id.* at 629. Each testified that poker was a game of skill because strategies can improve a player's odds; when multiple hands are played a skilled player is likely to prevail over an unskilled player; a player can learn certain skills that will allow him or her to win consistently; and studying books on strategy and implementing the strategies contained therein can help a player improve his or her skills. *Id.* The defense presented the testimony of an alcohol law enforcement officer, who had played poker for over 39 years. *Id.* He testified that while there was skill involved in poker, luck ultimately prevailed.

¶ 22 The trial court concluded that it was unable to determine, based on the testimony, whether chance or skill predominated in the game of poker but, nonetheless, concluded that poker was a game of chance within the meaning of North Carolina's statutory prohibition against wagering on games of chance. *Id.* The Court of Appeals affirmed, analyzing the case under the predominate-factor test; it stated:

[W]hile all games have elements of chance, games which can be determined by superior skill are not games of chance. For example, bowling, chess, and billiards are games of skill because skill determines the outcome. The game itself is static and the only factor separating the players is their relative skill levels. In short, the instrumentality for victory is in each player's hands and his fortunes will be determined by how skillfully he use (sic) that instrumentality.

Poker, however, presents players with different hands, making the players unequal in the same game and subject to defeat at the turn of a card. Although skills such as knowledge of human psychology, bluffing, and the ability to analyze odds make it more likely for skilled players to defeat novices, novices may yet prevail with a simple run of luck. No amount of skill can change a deuce into an ace. Thus, the instrumentality for victory is not entirely in the player's hand. In *State v. Taylor*, our Supreme Court noted this distinction. 111 N.C. 680, 16 S.E. 168 (1892).

> It is a matter of universal knowledge that no game played with ordinary playing cards is unattended with risk, whatever may be the skill, experience or intelligence of the gamesters engaged in it. From the very nature of such games, where cards must be drawn by and dealt out to players, who cannot anticipate what ones may be received by each, the order in which they will be placed or the effect of a given play or mode of playing, there must be unavoidable certainty as to the results.

*Id.* at 681–82, 16 S.E. at 169.

This is not so with bowling, where the player's skill determines whether he picks up the spare; or with billiards, where the shot will find the pocket or not according to its author's skill. During oral argument, counsel for plaintiff analogized poker to golf, arguing that while a weekend golfer might, by luck, beat a professional golfer such as Tiger Woods on one hole, over the span of 18 holes, Woods' superior skill would prevail. The same would be true for a poker game, plaintiff contended, making poker, like golf, a game of skill. This analogy, while creative, is false. In golf, as in bowling or billiards, the players are presented with an equal challenge, with each determining his fortune by his own skill. Although chance inevitably intervenes, it is not inherent in the game and does not overcome skill, and the player maintains the opportunity to defeat chance with superior skill. Whereas in poker, a skilled player may give himself a statistical advantage but is always subject to defeat at the turn of a card, an instrumentality beyond his control. We think that is a critical difference.

*Joker Club, L.L.C. v. Hardin*, 643 S.E.2d at 630–31.

¶ 23 Applying the "predominate-factor test" as enunciated by the Pennsylvania Supreme Court in *Two Electronic Poker Machines*, we agree with the cases cited above that, while the outcome of poker may be dependent on skill to some degree, it is predominantly a game of chance. While, as noted in *Two Electronic Poker Machines*, skill can determine the outcome in a poker game,[2] players are still subject to defeat at the turn of the cards.

---

**2.** The Pennsylvania Supreme Court did not hold that poker played in a game among competitors is a game wherein *skill* predominates. That issue was not before the court. Rather the issue was whether electronic pok-

¶ 24 Having found that Texas Hold 'Em Poker is gambling, we turn to the question of whether it is "unlawful gambling." In a 1975 case, this Court analyzed the term 'unlawful gambling' as used in Section 5513, sustaining a conviction for unlawful gambling. *Commonwealth v. Betres*, 237 Pa.Super. 361, 352 A.2d 495 (1975). In holding that the omission of definitions for 'unlawful gambling' and 'unlawful gambling place' did not render Section 5513 unconstitutional, we analyzed the issue as follows:

> While the statute in the instant case could be more clear, it is not so vague that we cannot determine what the legislature intended when it used the terms 'unlawful gambling' and 'unlawful gambling place.' The legislature has specifically authorized certain types of gambling such as the state lottery, harness racing, and thoroughbred racing. When the term unlawful gambling was used by the legislature they could have intended no other meaning than gambling not specifically authorized by the Commonwealth. This reasonable common sense interpretation is supported by Section 5512 of the Crimes Code. That section which deals with lotteries defines the term 'unlawful' as follows, 'As used in this section the term 'unlawful' means not specifically authorized by law.' There is no reason why the legislature would have intended 'unlawful' to have any different meaning in Section 5513 than it was given in Section 5512. Therefore the term 'unlawful,' as used in Section 5513 means not specifically authorized by law. A person who owns or who is in control of an establishment such as contemplated by the statute and who conducts and [sic] type of gambling

therein, except, of course, gambling authorized by law, may be prosecuted under this section.

*Id.* at 498–99.

¶ 25 As noted in *Betres*, the legislature has regulated horse racing, 4 P.S. § 325.101, the lottery, 72 P.S. § 3761–101, playing of Bingo, 10 P.S. § 301, and use of slot machines, 4 Pa.C.S.A. § 1101. The holding of *Betres* that "unlawful gambling" is any gambling that has not been authorized by the legislature controls the disposition of the instant case. *Betres*, 352 A.2d at 498–99.

¶ 26 This conclusion is buttressed by the recent passage and signing of the amendments to Pennsylvania Horse Race Development and Gaming Act, 4 Pa.C.S.A. § 1101, *et. seq.*, to allow for the authorization of table games, specifically naming poker as one, in certain licensed commercial facilities. *See* S.B. 711 2009, §§ 1102(2.1), 1103. The amendment further gives the Pennsylvania Gaming Control Board general and sole regulatory authority over the conduct and playing of table games, including poker, among others. *Id.* § 1202(a)(1). There would have been no reason for the legislature to act to authorize playing of poker in certain facilities if playing poker did not constitute "unlawful gambling" prior to said authorization.

¶ 27 For these reasons, we conclude that the Commonwealth presented sufficient evidence to establish a *prima facie* case that Appellees violated the applicable provisions of the Crimes Code. Accordingly, we reverse the Order of January 14, 2009, and remand for further proceedings consistent with this decision.

er machines were gambling devices subject to forfeiture.

¶ 28 Order **REVERSED.** Case **RE-MANDED.** Jurisdiction **RELIN-QUISHED.**

¶ 29 Judge COLVILLE files a Dissenting Opinion.

DISSENTING OPINION BY COLVILLE, J.:

¶ 1 I would affirm the trial court's order, albeit on different grounds than those presented by that court. I, therefore, dissent.

¶ 2 The Commonwealth has accused Appellants of hosting Texas Hold'em Poker tournaments. Ultimately, for Appellants to be found guilty in this case, the Commonwealth would have to prove beyond a reasonable doubt that Appellants engaged in "unlawful gambling" by hosting these tournaments. The relevant criminal statute does not define "gambling." Moreover, as the Majority observes, "[n]either a statute nor case law specifically address the legality of Texas Hold'em Poker." Majority Opinion at 192.

¶ 3 However, the Statutory Construction Act informs us,

Words and phrases shall be construed according to rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition.

1 Pa.C.S.A. § 1903(a). "Gambling" is a technical word that has acquired a peculiar and appropriate meaning. More specifically, an activity constitutes gambling if it has three elements: consideration, chance, and reward. *Commonwealth v. Two Elec-*

*tronic Poker Game Machines,* 502 Pa. 186, 465 A.2d 973, 977 (1983).

¶ 4 It is undisputed that the games played at Appellants' Texas Hold'em Poker tournaments contained the elements of consideration and reward. Appellants, however, filed a pre-trial petition for writ of *habeas corpus,* arguing that the Commonwealth could not produce sufficient evidence to establish a *prima facie* case against Appellants insomuch as the Commonwealth could not "show that the element of chance dominates and the outcome of the game[s were] determined predominately by chance rather than skill." Omnibus Pretrial Motion, 10/24/08, at ¶ 11.

¶ 5 "The Commonwealth establishes a *prima facie* case when it produces evidence that, if accepted as true, would warrant the trial judge to allow the case to go to a jury." *Commonwealth v. Marti,* 779 A.2d 1177, 1180 (Pa.Super.2001) (*quoting Commonwealth v. Martin,* 727 A.2d 1136, 1142 (Pa.Super.1999)). As to the element of chance, the Majority opines "that for a game to constitute gambling, it must be a game where chance predominates rather than skill." Majority Opinion at 5.

¶ 6 At the hearing on Appellants' writ of *habeas corpus,* the only evidence offered by the Commonwealth was the testimony of Pennsylvania State Police Trooper David Darrow. Trooper Darrow primarily described the game played at Appellants' tournaments. The Trooper did make passing reference to his views on the roles chance and skill played in these games.[1] However, the Commonwealth failed to present any evidence which, if accepted as true, would prove that the games played at Appellants' Texas Hold'em Poker tournaments were games where chance predominated rather than skill. In other words,

---

**1.** *See N.T.,* 12/15/08, at 13 ("You don't have to know anything. You could go there as an idiot and you may get lucky but over the course of time it would be beneficial to know the game of poker[.]").

the Commonwealth failed to meet its burden of proof at the hearing.[2]

¶ 7 Rather than focusing on the evidence presented by the Commonwealth at the hearing and determining whether that evidence, if accepted as true, would be enough to warrant submitting the case to a jury, the trial court looked to, *inter alia,* treatises and studies in concluding that Texas Hold'em Poker is predominately a game of skill. Although the Majority reaches a different result than that of the trial court, the Majority repeats the mistake of the trial court by failing to examine whether the Commonwealth met its burden of proof at the hearing. Instead, the Majority looks to the decisions of our sister states in concluding that the games played at Appellants' alleged tournaments constituted gambling.

¶ 8 In my view, the Commonwealth simply failed to meet its burden of establishing a *prima facie* case in that it failed to produce evidence, if accepted as true, that would warrant the trial judge to allow a jury to decide Appellants' "unlawful gambling" cases. Consequently, I would affirm the trial court's order, albeit on different grounds than those put forward by that court.

**2.** It is worth noting that, in *Two Electronic Poker Game Machines, supra,* in order to prove that the machines at issue in that case were illegal gambling devices, the Commonwealth offered an expert witness who "testified that no skill was involved in playing the game." *Two Electronic Poker Game Machines,* 465 A.2d at 978. In my view, had the Commonwealth offered similar evidence during Appellants' hearing, it would have met its burden of proof.