IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| DEPARTMENT OF CORRECTIONS, | ) | No. 34436-3-III |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| JEFFREY R. MCKEE, | ) | |
| | ) | |
| Respondent. | ) | |

LAWRENCE-BERREY, A.C.J. — In 2009, the legislature enacted RCW 42.56.565 to

address abusive requests for public records by persons serving criminal sentences. This

statute authorizes courts to enjoin such persons from inspecting or copying nonexempt

public records if the court finds that one of four situations applies. *See* RCW

42.56.565(2)(c)(i)-(iv). At issue in this case is the situation where "[t]he request was

made to harass or intimidate the agency or its employees." RCW 42.56.565(2)(c)(i).

Jeffrey McKee is an inmate in the custody of the Washington State Department of

Corrections (the Department). Since 2006, he has submitted at least 336 requests to the

Department under the Public Records Act (PRA), chapter 42.56 RCW, including 61

requests between December 2014 and February 2016. The Department sought a

preliminary injunction under RCW 42.56.565 to enjoin Mr. McKee from filing further requests. It argued RCW 42.56.565(2)(c)(i) applies when an inmate makes prolific records requests for the purpose of suing the agency and profiting financially. The trial court disagreed and interpreted this provision as being limited to situations in which inmates seek the private information of agency employees to harass those employees. The trial court therefore generally denied the Department's request for an injunction.

We consider the plain meaning of RCW 42.56.565(2)(c)(i), factors contained in RCW 42.56.565(3) and the legislative history of the statute. These considerations lead us to hold that an inmate's request or requests for public records may be enjoined under RCW 42.56.565(2)(c)(i) if the request or requests are burdensome and made for financial gain. Because the facts set forth by the Department permit the trial court to enter a preliminary injunction under this standard, we reverse the trial court and remand for further proceedings consistent with this opinion.

## FACTS

In 2005, Mr. McKee was convicted in King County of two counts of first degree rape while armed with a firearm. *State v. McKee*, 141 Wn. App. 22, 25, 167 P.3d 575 (2007). In July 2005, he entered the Department's custody. In March 2006, he was transferred to a privately operated prison in Arizona. While in the Arizona prison, Mr.

2

McKee was cellmates with a man named Matthew Silva. At some point, Mr. McKee was transferred back to Coyote Ridge Corrections Center in Washington.

Mr. McKee began sending public records requests to the Department. By 2009, he had submitted at least 85 requests. In late 2008 and early 2009, he made five separate requests for the records relating to the Department's contract with the private Arizona prison, four of which he sent on the same day. One month later, he again sent multiple requests on the same day.

In 2011, Mr. McKee submitted 60 records requests to the Department. In 2012, he submitted 79. In 2013, he submitted 51. One day, he submitted three separate requests seeking "every public records request received" by the Department for three different months. Clerk's Papers (CP) at 938, 940, 942. He also requested records relating to the women he had raped at gunpoint. *See McKee*, 141 Wn. App. at 28-29. He also requested records related to any investigation of his former Arizona cellmate, Mr. Silva.

Mr. McKee began filing lawsuits against the Department related to his PRA requests. He filed lawsuits in Franklin County, Spokane County, Thurston County, and in federal court. Mr. McKee employed his sister's company, Paralegal Services of Washington, to facilitate his lawsuits and PRA activity. This company would serve

papers, type and forward correspondence, and send payments on Mr. McKee's behalf related to the cost of copying documents.

In one of his lawsuits, Mr. McKee alleged the Department violated the PRA by denying his "request to view his inmate Central File." CP at 852. He attached a Department form to his complaint called a "CLASSIFICATION HEARING NOTICE/APPEARANCE WAIVER," which advised that he had a right to view his offender file. CP at 855.

In 2011, the Department settled three of these lawsuits with Mr. McKee for $9,500. But by 2013, Mr. McKee was the plaintiff in 12 active PRA lawsuits against the Department. In November 2013, the Department and Mr. McKee entered into another settlement agreement. As part of the agreement, the Department agreed to pay Mr. McKee $80,000. In exchange, Mr. McKee agreed to dismiss the 12 pending lawsuits, withdraw his outstanding PRA requests, not request any records created prior to the agreement, and refrain from submitting any other requests for one year. Mr. McKee also agreed to not submit requests through third parties during this one-year period.

Around this time, Mr. McKee's former cellmate, Mr. Silva, had been released from prison and was living in Shoreline, Washington. In December 2013, shortly after entering into the settlement agreement, Mr. McKee attempted to mail two letters to Mr.

4

Silva's address in Shoreline. Mailroom staff at the prison screened these letters and brought them to the Department's attention.[1]

In the first letter, Mr. McKee proposed the idea of having a recently released former inmate file PRA requests, so there would be "no bad faith requirement when we file suit." CP at 1005. He also proposed having this person request inmate news media, as "News Media are some of the higher PRA payouts," which would lead to "profit." CP at 1005. He also stated he would try to get the prison to issue him infractions and put him in segregation, "which will create more PRA suits." CP at 1005. He suggested contacting other individuals to "pitch the idea of us litigating PRA suits through them." CP at 1005. He also suggested starting a paralegal company so inmates could charge money for copies. The company would also conduct legal research, as the prison did not allow sufficient access to the library for PRA cases.

Mr. McKee further stated he "just did a PRA suit for this guy over his central file records." CP at 1006. He discussed discovery practices and negotiation tactics to generate larger settlement offers. For example, he said he would request a discovery conference and tell the Department he intended to depose witnesses, which usually prompted a settlement offer. He then gave instructions to request prison telephone logs

---

[1] We note that Mr. McKee denies he wrote these two letters.

5

and stated that, "You should make some quick cash on this PRA case." CP at 1006. He also gave instructions to request inmate central files, stating the Department would "withhold your FBI/WSP Rap Sheets which you are entitled to. That is what Chester won $100,000 for and Adams won $25,000.00 for." CP at 1006.

The second letter was similar to the first. Mr. McKee stated he had an "exhalent [sic] case" involving prison telephone logs. CP at 1147. He described how he had requested the records relating to the Department's contract with the private Arizona prison, and then "settled for $20,000.00 within 3 months." CP at 1147. He gave instructions to make these requests "[t]hen sue them under the PRA. It should bring you some quick cash." CP at 1147.

During the one-year period following the settlement agreement, Mr. McKee encouraged others to submit PRA requests and also encouraged them to sue the Department over those requests. He instructed his sister how to request the prison telephone logs. When her request was denied, he instructed her how to appeal, and told her the proper language to use. He also instructed her to file a lawsuit, which she did.

Mr. McKee also assisted other individuals with requests and lawsuits relating to the prison telephone logs. In early 2014, the Department received PRA requests from at least seven different Coyote Ridge inmates relating to the telephone logs. Multiple

6

inmates filed lawsuits. The complaints, interrogatories, and requests for production in these lawsuits were identical to filings in Mr. McKee's lawsuits.

In a deposition, one of these inmates acknowledged that Mr. McKee told him about the prison telephone logs, and also told him he could make a PRA request and file a lawsuit. He further acknowledged Mr. McKee helped him submit the request, and also drafted and typed the complaint. He agreed to pay Mr. McKee if his lawsuit was successful.

One of Mr. McKee's former cellmates, Karl Tobey, started a paralegal company after he was released from prison. The inmates would use this company to copy documents for their lawsuits. The inmates would then file cost bills to recoup these expenses, seeking amounts between $378 and $1,911.

In November 2014, the one-year period in which Mr. McKee could not submit PRA requests expired. Around this time, he requested to inspect his central file and also requested all records in his offender file "persuant [sic] to the classification notice/appearance waiver." CP at 844. The Department asked him to clarify his request. He never responded to the Department and filed a lawsuit. The trial court found the Department did not violate the PRA and this court affirmed. *See McKee v. Wash. State*

7

*Dep't of Corr.*, No. 33876-2-III (Wash. Ct. App. Aug. 16, 2016) (unpublished),

http://www.courts.wa.gov/opinions/pdf/338762_unp.pdf.

On December 1, 2014, the Department received two requests from Mr. McKee. He sought all telephone logs from his inmate account since 2011. He also sought his risk assessments, which were at issue in another inmate's PRA lawsuit against the Department.

On December 5, the Department received four more requests from Mr. McKee. Between December 2014 and December 2015, he submitted 54 requests, many of which he submitted in batches on the same day. In one request, he sought "all communications between [the Department] and its employees to or from the Washington State Legislature and/or its agents or employees regarding prison inmates and the Public Records Act between 2005 and 2015." CP at 959. Department staff spent over 18 hours on this request. In another request, he sought "investigation packets related to any investigation of any Coyote Ridge Corrections Center (CRCC) staff, employee and/or contract staff for any allegations of any type of misconduct from 11/21/13 to 4/23/15." CP at 959. Department staff spent over 12 hours on this request. In December 2015, the Department had 12 pending requests from Mr. McKee. By February 2016, Mr. McKee had sent the Department at least 336 records requests in total.

8

PROCEDURE

In December 2015, the Department filed suit against Mr. McKee to enjoin him from making public records requests and from receiving responses to his pending records requests. The Department also requested that the trial court enter a preliminary injunction until a hearing on the merits occurred. The Department supported its request with declarations setting forth an exhaustive history of Mr. McKee's PRA requests. The Department argued it was entitled to a preliminary injunction because Mr. McKee's extensive PRA activity harassed or intimidated the agency or its employees, as prohibited by RCW 42.56.565(2)(c)(i). Mr. McKee responded to the Department's preliminary injunction request. His principal assertion was that his history of PRA requests involved good faith inquiries for public records. The Department responded with another series of declarations refuting Mr. McKee's assertions.

The trial court did not attempt to resolve the factual issues raised in the competing declarations. Rather, the trial court disagreed with the Department's argument that RCW 42.56.565(2)(c)(i) authorized injunctive relief against inmates profiting from extensive PRA requests. The trial court construed RCW 42.56.565(2) as only addressing the problem of inmates seeking private information of agency employees and then harassing

9

those employees, much like what Allan Parmelee did.[2] Because Mr. McKee was not harassing agency employees in the manner similar to Allan Parmelee, the trial court generally denied the Department's request for a preliminary injunction.

After the trial court entered its order, the Department filed a motion in this court for discretionary review. It argued the trial court's interpretation of the statutory language was purely legal and would not change at a hearing for a final injunction, thus rendering further proceedings useless. We agreed and granted the Department's motion for discretionary review under RAP 2.3(b)(1).

## ANALYSIS

A.   STANDARD OF REVIEW

The question before us is whether the trial court properly construed RCW 42.56.565(2)(c)(i) when it generally denied the Department's request for a preliminary

---

[2] Allan Parmelee was an inmate in the Department's custody who had a long history of submitting public records requests to obtain personal information of government employees. *Burt v. Dep't of Corr.*, 168 Wn.2d 828, 830, 832, 231 P.3d 191 (2010). "He sought photographs, addresses, incomes, retirement and disability information, administrative grievances or internal investigations, and any other related documents." *Id.* at 832. He would then harass and threaten these employees by publishing their private information on public web sites, issuing "press releases" and flyers accusing them of being "sexual predators," sending threatening letters to their homes, hiring individuals to follow them and picket their houses, and filing administrative grievances and lawsuits. *King County Dep't of Adult & Juvenile Det. v. Parmelee*, 162 Wn. App. 337, 342, 254 P.3d 927 (2011); *DeLong v. Parmelee*, 157 Wn. App. 119, 134-

10

injunction. Statutory construction is a question of law that we review de novo. *State v. Gonzalez*, 168 Wn.2d 256, 263, 226 P.3d 131 (2010).

B.    CONSTRUCTION OF RCW 42.56.565(2)(c)(i)

The Department argues it is entitled to a preliminary injunction under RCW 42.56.565(2)(c)(i). That subsection allows courts to enjoin inmates from copying or inspecting a record if the request is "made to harass or intimidate the agency or its employees." The Department argues that an inmate who files prolific records requests in an effort to profit financially "harasses" the agency within the meaning of this provision. The Department contends the trial court erred in concluding that this provision is limited to situations where an inmate seeks the private information of agency employees to harass those employees.

The PRA is a "strongly worded mandate for broad disclosure of public records." *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 127, 580 P.2d 246 (1978). It requires all state and local agencies to make any public record available for public "inspection and copying" on request, unless the record falls within certain specific exemptions. RCW 42.56.070(1); RCW 42.56.080. The policy behind this law is that "free and open examination of public records is in the public interest." *Neighborhood All. of Spokane County v. Spokane*

---

35, 236 P.3d 936 (2010).

*County*, 172 Wn.2d 702, 715, 261 P.3d 119 (2011). To promote this policy, the PRA is to be "liberally construed and its exemptions narrowly construed." RCW 42.56.030.

In 2009, the legislature enacted RCW 42.56.565 to address abusive requests for public records by inmates. *See* LAWS OF 2009, ch. 10, § 1. This statute authorizes courts to enjoin the "inspection or copying of any nonexempt public record by persons serving criminal sentences in state, local, or privately operated correctional facilities" if the court finds that one of following four situations applies:

> (i) The request was made to harass or intimidate the agency or its employees;
> (ii) Fulfilling the request would likely threaten the security of correctional facilities;
> (iii) Fulfilling the request would likely threaten the safety or security of staff, inmates, family members of staff, family members of other inmates, or any other person; or
> (iv) Fulfilling the request may assist criminal activity.

RCW 42.56.565(2), (2)(c).

The statute then gives a nonexhaustive list of factors a court may consider in deciding whether to enjoin an inmate's past or future records requests. *See* RCW 42.56.565(3). These factors include: (1) other requests by the requestor, (2) the type of records sought, (3) statements offered by the requestor concerning the purpose for the request, (4) whether disclosure of the requested records would likely harm any person or vital government interest, (5) whether the request seeks a significant and burdensome

12

number of documents, (6) the impact of disclosure on correctional facility security and order, the safety or security of correctional facility staff, inmates, or others, and (7) the deterrence of criminal activity. RCW 42.56.565(3)(a)-(g).

On a showing by a preponderance of the evidence, a court may "enjoin all or any part of a request" for public records, and may also enjoin future requests by the same requestor for a reasonable period of time. RCW 42.56.565(4). An agency is not liable for PRA penalties while an order under this statute is in effect, including the time it is under appeal, regardless of the appeal's outcome. RCW 42.56.565(5). At issue in this case is whether the first of the four situations enumerated above applies to Mr. McKee's requests—whether they were "made to harass or intimidate the agency or its employees." RCW 42.56.565(2)(c)(i).

### 1. *Principles of statutory construction*

The fundamental goal of statutory interpretation is to discern and implement the legislature's intent. *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003). When interpreting a statute, courts look first to the statute's plain meaning. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). "Plain meaning is discerned from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." *Christensen*

13

*v. Ellsworth*, 162 Wn.2d 365, 373, 173 P.3d 228 (2007). "If the statutory language is susceptible to more than one reasonable interpretation, then a court may resort to statutory construction, legislative history, and relevant case law for assistance in discerning legislative intent." *Id.*

When construing statutory language, "'each word of a statute is to be accorded meaning.'" *State v. Roggenkamp*, 153 Wn.2d 614, 624, 106 P.3d 196 (2005) (quoting *State ex rel. Schillberg v. Barnett*, 79 Wn.2d 578, 584, 488 P.2d 255 (1971)). "'[T]he drafters of legislation . . . are presumed to have used no superfluous words,'" and courts must ascribe meaning to every word in a statute. *Id.* at 624 (alterations in original) (internal quotation marks omitted) (quoting *In re Recall of Pearsall-Stipek*, 141 Wn.2d 756, 767, 10 P.3d 1034 (2000)).

> 2. *RCW 42.56.565(2)(c)(i) applies when requests are made to harass agencies themselves, in addition to their employees*

The principle that each word in a statute has meaning supports interpreting RCW 42.56.565(2)(c)(i) to include requests made to harass the agency itself, rather than just its employees. A court may enjoin requests if "[t]he request was made to harass or intimidate the agency *or* its employees." RCW 42.56.565(2)(c)(i) (emphasis added). If the legislature wanted to only address situations where the inmate seeks the private information of agency employees to harass those employees, it would have only referred

14

to employees. In order for the word "agency" to have meaning, the provision must apply when an inmate seeks to harass the agency itself.

Although RCW 42.56.565(2)(c)(i) clearly protects an agency from being harassed or intimidated by an inmate who makes a records request, the scope of the provision is unclear and examination beyond the statutory language is required.

> 3. *Discerning the scope of RCW 42.56.565(2)(c)(i) requires examining the plain language of the statute, the factors set forth in RCW 42.56.565(3), and legislative history*

The legislature's intent for this provision is first evidenced by the ordinary meaning of the language at issue. "Harass" is defined as "to worry and impede by repeated attacks . . . to tire out . . . to vex, trouble, or annoy continually or chronically." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1031 (1993). The plain meaning of this word indicates this provision applies when an inmate submits multiple records requests that impede, tire, vex, trouble, or annoy an agency.

The legislature's intent is further evidenced by a related provision, RCW 42.56.565(3), which lists factors for courts to consider when deciding whether to enjoin inmate records requests. RCW 42.56.565(3) lists the following factors that are pertinent to records requests that might harass an agency: (1) other requests by the requestor, (2) the type of record or records sought, (3) the requestor's statements offered concerning the

15

purpose of the request, and (4) whether the request seeks a significant and burdensome number of documents. These factors would permit a trial court to even enjoin an inmate's first records request, provided the request was sufficiently burdensome and without a legitimate purpose.

Finally, the legislative history demonstrates the legislature intended the statute to apply to requestors who abuse the PRA for financial gain. The senate bill report, in describing the purpose for the bill, states:

> [T]here is a small group of offenders who are abusing the system. . . . Some are using the system for financial gain and make outrageous public records requests in order to sue the department for not providing records. Last year, 87 lawsuits were filed against the state for the failure to provide public records. Sixty-eight of these were filed by inmates. This bill does not categorically prevent inmates from making a public records request but is narrowly tailored to allow the Department of Corrections (DOC) to address those few who are abusing the system.

S.B. REP. ON SECOND SUBSTITUTE S.B. 5130, at 2, 61st Leg., Reg. Sess. (Wash. 2009).

The house bill report similarly states:

> Over the past several years, incarcerated felons have been flooding state and local governments with requests intended to overburden the public records staff. . . . The inmates hope to either gain the information which can be used to further harass the employees or to trigger a violation of the PRA that results in fines payable to the inmate.

H.B. REP. ON SECOND SUBSTITUTE S.B. 5130, at 3, 61st Leg., Reg. Sess. (Wash. 2009).

16

At a hearing before the Senate Committee on Human Services and Corrections, which was the sponsor of the substitute senate bill, a witness testified about the need for the bill:

> Not only are incarcerated felons, like these two gentlemen, using the Public Records Act to harass public employees, they are increasingly turning to Public Records Act litigation as a money making venture. In fact, in the materials that I have provided you, there is a letter from Mr. Parmelee to his brother, also an inmate in the federal system in Michigan. In that letter, Mr. Parmelee goes so far as to propose a business venture, the sole purpose of which is to make money off of public records requests. I think you will find that letter interesting and it illustrates the mindset of these few inmates who are abusing the system.

Hr'g on S.B. 5130 Before the S. Human Servs. and Corr. Comm., at 25:48, 61st Leg., Reg. Sess. (Wash. Jan. 29, 2009), *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org.

Mr. McKee argues RCW 42.56.565(2)(c)(i) should not be construed as applying to profit-driven inmate PRA litigation. He relies on RCW 42.56.565(1), which was added to the statute in 2011. *See* LAWS OF 2011, ch. 300, § 1. This subsection provides that a court may not award an inmate penalties in a PRA lawsuit unless the court finds that the agency acted in bad faith in responding to the inmate's request. RCW 42.56.565(1). Mr. McKee argues that *this* subsection is meant to address the problem of inmates who abuse

17

the PRA for profit, and that also interpreting RCW 42.56.565(2)(c)(i) this way would render subsection (1) superfluous.

Mr. McKee is correct the legislature added subsection (1) to discourage profit-driven inmate PRA litigation. *See* S.B. REP. ON SECOND SUBSTITUTE S.B. 5025, at 2-3, 62nd Leg., Reg. Sess. (Wash. 2011). Although these subsections each address the same problem, they serve different purposes. When an inmate files prolific records requests and sues an agency, subsection (1) ensures the agency will not have to pay penalties in the event it makes a good faith error in responding. However, even if the agency is not required to pay penalties, it is still obligated to respond to future requests. *See Francis v. Dep't of Corr.*, 178 Wn. App. 42, 62-63, 313 P.3d 457 (2013) (holding that the failure to conduct a reasonable search constitutes "bad faith"). This is still burdensome and expensive, even if the agency does not have to pay penalties. To alleviate these burdens and expenses, subsection (2)(c)(i) allows the agency to seek to enjoin the inmate from making future requests, just like the Department did here. For this reason, subsection (1) and subsection (2)(c)(i) are complementary, and neither renders the other superfluous.

Given the plain language of the statute, the factors the legislature directed courts to consider, and the legislative history of the particular statute, we hold: An inmate's request

18

or requests for public records may be enjoined under RCW 42.56.565(2)(c)(i) if the request or requests are burdensome and made for financial gain.

## C.   REMEDY

The Department urges this court to reverse the trial court *and* to remand with directions for the trial court to enter a preliminary injunction. Although we reverse the trial court's construction of RCW 42.56.565(2)(c)(i), we decline to direct the trial court to enter a preliminary injunction.

One reason for declining is because there are competing issues of material fact. We acknowledge that an appellate court may substitute its findings for the lower court when facts were presented below by written declarations and a weighing of the evidence by the trial court was unnecessary. *Bainbridge Island Police Guild v. City of Puyallup*, 172 Wn.2d 398, 407, 259 P.3d 190 (2011). But here, a weighing of the evidence arguably is necessary. An additional reason for declining is because the trial court should determine the scope of the preliminary injunction, if one is appropriate. For instance, the trial court might find that one or more pending records requests should not be enjoined under the standard we have adopted.

We finally note that RCW 42.56.565(4) provides for entry of an injunction by a summary motion proceeding based on affidavits and declarations, unless the court orders

19

otherwise. There is nothing that prohibits the Department from asking the trial court, on remand, to promptly issue a final injunction or to promptly set the matter for argument toward such an injunction. Unless the trial court authorizes discovery and directs a hearing, the rapidity envisioned by RCW 42.56.565(4) likely renders moot any need for a preliminary injunction.

We, therefore, reverse the trial court's construction of RCW 42.56.565(2)(c)(i) and remand this matter for further proceedings consistent with this opinion.

Lawrence-Berrey, A.C.J.

WE CONCUR:

Korsmo, J.

Pennell, J.

20