J-A21028-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| ONE (1) JERSEY HOLD 'EM MACHINE SERIAL NO. DDGPA0003 ONE (1) RED, WHITE, & BLUE GAMING MACHINE SERIAL NO. DDGPA0002 | |
| | No. 309 EDA 2014 |

Appeal from the Order December 18, 2013
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-MD-0001060-2011

BEFORE:  BOWES, J., OTT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED DECEMBER 23, 2014**

The Commonwealth appeals from the order entered on December 18, 2013, declaring two machines, one Jersey Hold'em Machine, Serial No. DDGPA0003, and one Red, White, & Blue Gaming Machine, Serial No. DDGPA0002, (collectively, "Two Machines"), to be games of skill rather than chance, and consequently, not gambling devices as outlined in 18 Pa.C.S. § 5513(a).[1]  The Commonwealth contends the trial court erred as a matter of

---

[*] Retired Senior Judge assigned to the Superior Court.

[1]  A person violates Section 5513 based on the following:

*(Footnote Continued Next Page)*

law and/or fact in finding that the Two Machines were predominately games of skill, and therefore, could not be confiscated pursuant to the gaming statute. Based on the following, we affirm.

We summarize the facts and procedural history as follows. On October 15, 2010, state troopers seized the Two Machines at an American Legion establishment, Knowles-Doyle Post 317 ("ALP"), in Yardley, Pennsylvania. It was the Commonwealth's position that the Two Machines were being commercially offered, used, and operated by the general public at the ALP in violation of Section 5513(a). Following the seizure, the Commonwealth filed a motion for condemnation and forfeiture on April 18, 2011, and a petition

_(Footnote Continued)_ —————————

> (a) Offense defined. --A person is guilty of a misdemeanor of the first degree if he:
>
> > (1) intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, slot machine or any device to be used for gambling purposes, except playing cards;
> >
> > (2) allows persons to collect and assemble for the purpose of unlawful gambling at any place under his control;
> >
> > 3) solicits or invites any person to visit any unlawful gambling place for the purpose of gambling; or
> >
> > 4) being the owner, tenant, lessee or occupant of any premises, knowingly permits or suffers the same, or any part thereof, to be used for the purpose of unlawful gambling.

18 Pa.C.S. § 5513(a).

- 2 -

for forfeiture hearing on May 27, 2011. Martin Caplan, owner of the Two Machines, filed an answer to petition for forfeiture on August 25, 2011. A hearing was held on October 18, 2013, and the matter was continued until December 18, 2013 for the admission of additional evidence.[2] On that same day, the court entered an order declaring the Two Machines to be games of skill and not games of chance. It concluded that the Two Machines were not gambling devices under Section 5513(a) and therefore, they were wrongfully confiscated. The Commonwealth filed this timely appeal.[3, 4]

_____

[2] The trial court explained that the two-year period between the petitions and the hearings was "due to the necessary and timely procurement of expert reports and the Commonwealth's lack of response to numerous defense requests to schedule a hearing." Trial Court Opinion, 4/2/2014, at 2.

[3] On January 8, 2014, the trial court ordered the Commonwealth to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The Commonwealth complied with the trial court's directive and filed a concise statement on January 28, 2014. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on April 2, 2014.

[4] Initially, we note the Commonwealth admits that it mistakenly filed this appeal with our Court and not with our sister court, the Commonwealth Court, because appeals from decisions in forfeiture actions fall under the jurisdiction of the Commonwealth Court. *See* 42 Pa.C.S. § 762(a)(1)(ii); 47 P.S. § 6-602(a) ("The proceedings for the forfeiture or condemnation of all property shall be *in rem*, in which the Commonwealth shall be the plaintiff and the property the defendant."); *see also Commonwealth v. McDermond*, 560 A.2d 901 (Pa. Commw. 1989). Nevertheless, the Commonwealth noted Caplan did not file an objection to this Court's jurisdiction. The Commonwealth asserts that the challenge is now waived, and we may retain jurisdiction in the interest of judicial economy. *Commonwealth v. Smith*, 722 A.2d 167 (Pa. Super. 1998). We agree, and will address the merits of this appeal.

- 3 -

On appeal, the Commonwealth contends the trial court erred in finding the two gaming machines were predominately games of skill because it claims the court "relied upon mere assumptions and conclusions unsupported by adequate facts or competent evidence." Commonwealth's Brief at 26. Furthermore, the Commonwealth asserts the competent evidence established that for each of the machines, the outcome of the game was predominately based on chance or luck, rather than any purported skill of the player. *Id.* The Commonwealth states that based on testimony of its expert witness, Daryl Robert Sertell, while "it may be possible for a player to attempt to use visual cues during play … any such outcomes, as demonstrated, are overwhelming[ly] based on 'luck,' chance or random outcome and not selection by the player." *Id.* at 36. Moreover, the Commonwealth argues the court's reliance on the defense witnesses, Caplan, and expert, Nick Farley, is misplaced because they based their opinions on "the physical action of a player in pushing a button to stop a reel," whereas, Sertell stated that "the physical actions of putting money in a machine and pushing buttons, even within a certain amount of time allotted, is not the same as getting a particular intended result or desired by the intentional manipulation of the controls of the machines." *Id.* at 37. The Commonwealth states, "Common sense dictates the same as merely pressing a button requires no special intelligence, knowledge, memory, or dexterity." *Id.*

The "standard of review applied in cases involving petitions for forfeiture and motions for the return of property is for an abuse of discretion." *Beaston v. Ebersole*, 986 A.2d 876 (Pa. Super. 2009). "The three elements of gambling under Pennsylvania law are consideration, chance, and reward." *Commonwealth v. Dent*, 992 A.2d 190, 191 (Pa. Super. 2010). Moreover, in determining whether a gaming machine is a game of chance or skill, Pennsylvania courts have employed the "predominate-factor test" as set forth in *Commonwealth v. Two Electronic Poker Game Machines*, 465 A.2d 973 (Pa. 1983), and applied in *Dent*, *supra*. The "predominate-factor test" "holds that for a game to constitute gambling, it must be a game where chance predominates rather than skill." *Dent*, 992 A.2d at 193 (citation omitted).[5]

_____

[5] In *Two Electronic Poker Game Machines*, the Supreme Court stated:

> [T]he mere fact that a machine involves a substantial element of chance is insufficient to find the machine a gambling device *per se*. Thus a showing of a large element of chance, without more, is not sufficient. Nor must the outcome of a game be wholly determined by skill in order for the machine to fall outside the *per se* category. As Superior Court pointed out:
>
> > A peculiar combination of luck and skill is the sine qua non of almost all games common to modern life. It is hard to imagine a competition or a contest which does not depend in part on serendipity. It cannot be disputed that football, baseball and golf require substantial skill, training and finesse, yet the result of each game turns in part upon luck or chance.

*(Footnote Continued Next Page)*

After a thorough review of the transcripts from the two-day forfeiture hearing, we find the trial court, in its Rule 1925(a) opinion, thoroughly and accurately summarized the testimony presented by the witnesses for the Commonwealth and the defense. *See* Trial Court Opinion, 4/2/2014, at 2-12. We also conclude the court provided a well-reasoned basis for its determination that the Two Machines were games of skill. *Id.* at 12-17 (finding the Two Machines were predominately games of skill based on the following: (1) the results as to the high win percentage and payout percentage following the testing of the machines for a period of six (6) weeks; (2) unlike traditional casino slot machines, these machines only operate if the customer manually initiates the stop buttons; (3) neither machine is equipped with a "random number generator" in the source codes; (4) the order of the symbols/cards on the respective reels, although not sequential, is fixed; (5) there existed a consistency in how far the reel would continue to travel before it came to a complete stop after the button was initiated; and (6) there was no dispute that both machines were significantly modified). We conclude that the trial court's opinion properly disposes of

*(Footnote Continued)* ─────────────

> We are thus left with the task of determining in each case the relative amounts of skill and chance present in the play of each machine and the extent to which skill or chance determines the outcome.

*Two Electronic Poker Game Machines*, 465 A.2d at 977 (citations and quotations marks omitted).

- 6 -

the issue in this case. Accordingly, we affirm on the basis of that opinion, while adding the following comment.

The forfeiture hearing was essentially a battle of the expert witnesses, with each party's expert arguing why certain factors pointed either to skill or chance. The Honorable Albert J. Cepparulo gave greater weight to the defense expert testimony of Farley, particularly to the fact that Farley's "employees, following familiarization with the machines, were able to locate visual cues on the reels that would give them the ability to stop the machines in consistent locations." Trial Court Opinion, 4/2/2014, at 16.[6] Judge Cepparulo, sitting as fact-finder, was free to do so. ***See Commonwealth v. Puksar***, 951 A.2d 267, 276 (Pa. 2008) ("The expert testimony offered at trial by both sides amounted to a battle of the experts, with the [fact-finder] as the ultimate referee based upon its assessment of the credibility of the experts."). We are bound by this determination. Accordingly, the Commonwealth's sole argument fails.

Order affirmed.

Judge Bowes joins the memorandum.

Judge Strassburger files a dissenting memorandum.

---

[6] Likewise at the proceeding, Judge Cepparulo stated, "Mr. Farley was able to get into the heart and soul of these machines by going into their computer programming, and that's perhaps the most important part of the machines to determine how they're going to act depending on what the player does." N.T., 12/18/2013, at 91.

J-A21028-14

- 8 -

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/23/2014

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA : No. CP-09-MD-0001060-2011
vs. : 309 EDA 2014

One (1) Jersey Hold
'em Machine
Serial No. DDGPA0003
One (1) Red, White & Blue Reel
Gaming Machine
Serial No. DDGPA0002
(In Re: 2 Gaming Machines, DDGPA 0003 &
DDGLA0002)
(Martin Caplan)

## OPINION

### I. INTRODUCTION

Appellant, the Bucks County District Attorney's Office, appeals to the Superior Court of

Pennsylvania from this Court's December 18, 2013 Order declaring the Two Machines

referenced herein to be games of skill and not chance. We file this Opinion pursuant to

Pennsylvania Rule of Appellate Procedure ("Pa.R.A.P.") 1925(a).

### II. FACTUAL AND PROCEDURAL BACKGROUND

On October 15, 2010, there was a consensual seizure action in which Martin Caplan,

owner of One (1) Jersey Hold 'em Machine, Serial No. DDGPA0003, and One (1) Red, White &

Blue Reel Gaming Machine, Serial No. DDGPA0002 (referred hereinafter as "Two Machines"),

was present at the Knowles-Doyle Post 317 ("ALP") in Yardley, PA when Trooper Ricky

Goodling of the Pennsylvania State Police, Bureau of Liquor Control Enforcement, took

possession of the Two Machines and thereafter delivered them to the Bucks County District

Attorney's Office. It was the Commonwealth's position that they were then being commercially

offered, used, and operated by the general public at the ALP in violation of 18 Pa.C.S. §5513(a)

and, thus, were subject to seizure. This case arises from our subsequent Order that the Two Machines in question were predominantly games of skill rather than chance and, consequently, not unlawful gambling devices as outlined in the Pennsylvania Criminal Code at 18 Pa.C.S. §5513(a).

Following seizure, on April 18, 2011, the Commonwealth filed a Motion for Condemnation and Forfeiture and on May 27, 2011, they filed a Petition for Forfeiture Hearing. On July 6, 2011, a hearing was scheduled and later continued. Thereafter on August 25, 2011, an Answer to Petition for Forfeiture was filed by Attorney Robert Scandone on behalf of Martin Caplan, owner of the Two Machines. Almost two (2) years later on July 29, 2013, due to the necessary and timely procurement of expert reports and the Commonwealth's lack of response to numerous defense requests to schedule a hearing, Attorney Scandone filed a Petition to Request a Hearing, in which a hearing was scheduled for October 18, 2013. A hearing was held and the matter was continued until December 18, 2013 for the admission of additional evidence.

a. **October 18, 2013 and December 18, 2013 Hearings**

Daryl Robert Sertell, testifying on behalf of the Commonwealth, is employed by Casino Horizons Corporation, which is a training and consulting firm which specializes in gambling and slot machines. (N.T., 6, See Exhibit C-1.) Mr. Sertell's expertise with regard to the gaming industry was far-reaching, including his experience at the Philadelphia Coke Mechanics school, in which he was trained to repair Coke machines and slot machines starting in 1956; his work with the Atlantic City county college in instituting a Casino Career Institute as a factory-authorized instructor and receiving hands-on training in the working and repairing of the machines; instituting and instructing the Police Officers Gaming Seminar; teaching a Slot Department Management Course for eighteen (18) years; professional electronics instructor

certificate he earned in 1977; professional slot instructor license awarded by the New Jersey Casino Control Commission in 1979[1], and, although he is now retired, he continues to work as a consultant in this field. (N.T., 6-13, 21, 10/18/2013; See Exhibit C-1). As a result of his vast knowledge and experience, we accepted him as an expert in the field of gambling, gaming devices, and slot machines. (N.T., 21, 10/18/2013.)

In his examination of the machines in the present case, Mr. Sertell first began by playing sixty (60) games on each in order to better familiarize himself and determine the mode in which they operate.[2] (N.T., 25-26, 10/18/2013.) In regards to the Red, White, and Blue machine, Mr. Sertell initially examined the inside of the machine and observed it was built by the Bally Manufacturing Corporation and contained a Bally Manufacturing sticker and a "casino placard." (N.T., 27, 10/18/2013.) In order to operate the machine, the customer is expected to insert U.S. currency and a "meter on the top right-hand front of the game will illuminate and tell the customer how many credits they have put in." (N.T., 29, 10/18/2013.) The machine is equipped with what is referred to as an "award card," in that certain results and combinations, if achieved, will reap particular "rewards" or earnings from the machine. (N.T., 30-31, 10/18/2013.) Customers are encouraged to "bet" a certain amount of the credits against the "award card." (Id.) Following this "bet," a customer has the option of pressing either the "spin" button or the "play credits" button in order to start the reels. (N.T., 31, 10/18/2013.)

In terms of the reel spin, all three reels will begin to spin in the same instant, however, the left-hand reel will stop first followed by the second then the third. (N.T., 32, 10/18/2014). The customer is expected to push the "stop" button located in front of the three respective wheels, and in cases in which they fail to do so the reels will spin until they time out at

---

[1] This license has since expired. (N.T., 17-18, 10/18/2013.)
[2] This was Mr. Sertell's first time playing these particular types of machines as configured. (N.T., 66, 10/18/2013.) Numerous photographs of both machines are contained in Exhibit C-2, Tab 3.

approximately fifteen (15) seconds and the customer's money would be returned.[3] (N.T., 32, 35, 10/18/2013.) Based on the computer program that drives the machine, there are twenty-two (22) different positions in which the machine can stop along the reel, i.e., twenty-two (22) images on each individual reel. (N.T., 35-37, 10/18/2013.) Mr. Sertell testified that in order to view the symbols as the reel is spinning, the customer must look through the three "silk screen windows" on the glass of the machine. (N.T., 37, 10/18/2013.) Mr. Sertell intimated that after playing the game thirty (30) or forty (40) times, it was his opinion that

> ...because the customer is offered these three skill stop buttons, that the customer can then develop enough skill by watching one go by and figuring out when to stop each of the three reels in order to catch a winning combination. However, the customer doesn't work in the business and doesn't know anything about 22-position reels. All they can see is inside this window, and the speed of the advance of the reels is such that I couldn't make out one symbol from the other.

(N.T., 37-38, 10/18/2013.)

In this testing of the Red, White, and Blue machine, Mr. Sertell began by inserting money into the machine, playing with the credits that are given, and making at least twenty (20) tries in a row based on the idea that after twenty tries "human concentration lapses" in an attempt to achieve a pre-chosen outcome. (N.T., 24-25, 10/18/2013.) During these plays, Mr. Sertell, along with the Trooper involved in this case, were looking for a particular result. (N.T., 45-46, 10/18/2013.) The test results were memorialized in a series of Mr. Sertell's expert report. (See Exhibit C-3 & C-4.) For instance, they tried to successfully stop on the three red "7s" since they were red in color and, thus, "easiest to spot" as the reel was moving. (Id.; See Exhibit C-3 & C-4.) On four instances he was able to stop a particular reel on a specific red "7," however, he did not achieve the paying outcome of stopping on all three. (N.T., 45-48, 10/18/2013; See Exhibit

---

[3] These individual manual "stop buttons" for each reel are not offered in a traditional casino game. (N.T., 39, 10/18/2013.)

C-3 & C-4.) He had a more successful experience when he attempted to stop the reels on three double black bars and, although he could only achieve this objective one time out of the twenty attempts, he was able to stop a total of thirteen of the reels on the double black bars in other attempts, respectively. (N.T., 48-49, 10/18/2013; See Exhibit C-4.) Mr. Sertell attempted to synchronize his playing with the sound track of the game, but was unable to. (N.T., 52-53, 10/18/2013.)

Mr. Sertell concluded that, based on his testing of the machine, the reel continues to move after the stop button is initiated for approximately one (1) to three (3) symbols. (N.T., 39-40, 10/18/2013.) He stated that if an individual learned that the reel did not stop on the symbol in their view at the exact instant the stop button was pressed and instead would move forward to the next, second, or third symbol, it would be possible to learn what exact symbol the reel would stop on. (N.T., 40, 10/18/2013.) However, following his answer in the affirmative that it was possible, he went on to testify as follows:

> The customer has no way to achieve that learning…For the customer the only way is to look through the window—that is why I point them out—and with the speed of advance of the reels, the customer has no way to tell where one part of the circle ends and the next one begins. So, there is no stopping, there is no ending, it just goes by and by. The customer would have no way to develop that.

(N.T. 40-41, 10/18/2013.) He determined that the machine is not programmed to alternate the speed with which the reels spin[4] and the speed of advance of the reels was "sufficiently fast" and he was unsuccessful in determining which symbol was "coming next." (N.T., 43, 10/18/2013.)

The following dialogue occurred between this Court and Mr. Sertell:

> The Court: …Let's say that I decide I'm going to waste some money to learn this machine, I put in a number of credits, and each time I press [the stop button] I watch

---

[4] Mr. Sertell noted that "I did find some circumstances, perhaps due to malfunction, where one reel spun a little more slowly or a little faster than its neighbor." (N.T., 41, 10/18/2013.)

just the left [reel], and I noticed if I press it on two bars it stops on three bars, and I'm just using that as an example, then wouldn't I have learned at least one column?

The Witness: Sir, the method you are describing is known in the industry as a visual trigger. You described that your two bar, when it comes up you have learned that if I push it down, while I won't get a two bar I may get something else that I want; that is a visual trigger.

The Court: Wait a minute. When you say 'something else,' the next thing up always is the same thing; is it now?

The Witness: Yes, sir. But you don't always get that.

The Court: I know that that is the problem, that you might get one space more, two spaces more or three symbols more, is what I meant to say, that it might to further and further, but if you run it around enough you have at least an idea of where you think it would stop, wouldn't you?

The Witness: You could, yes, sir.

(N.T., 41-42, 10/18/2013.)

Ultimately, however, it was Mr. Sertell's expert opinion that he would qualify the Red, White, and Blue machine as a game of chance. (N.T., 53, 83-86, 10/18/2013.)

Moving onto the Jersey Hold 'Em machine, Mr. Sertell explained that it "offers the player the opportunity to engage the machine in what looks like a game of five-card poker. The winning hands are on the top section of the award card... [T]hey say that the player who can achieve a straight flush who has bet three coins will be paid $150. And five of a kind is the even bigger jackpot. If you achieve five of a kind and you have bet three coins, the machine says it will pay you one-thousand-two-hundred coins for having achieved that result." (N.T., 55-56, 10/18/2013.) Following insertion of currency, a customer can choose to "wager" one, two, or three coins. (N.T., 56, 10/18/2013.) The top two reels (which represent the first two cards a player is "dealt") will then begin to spin and stop automatically without any player input. (N.T.,

56-57, 10/18/2013.) Below the top two reels there is a second row containing three reels where a customer must manually initiate three "skill-stop" buttons alternatively to stop the reels. (N.T., 57, 10/18/2013.) Like that in the Red, White, and Blue machine, there is a fifteen (15) second time out period. (Id.) Upon his internal examination of the machine, he determined that it was manufactured by "Bally Manufacturing." (N.T., 58, 10/18/2013.) The traditional coin tray was modified so that instead of a customer being awarded with coins for a winning combination, the customer instead is given the option to print out a cash ticket. (Id.) Furthermore, based on some of the parts that were still contained in the machine, including the cash box and the plastic plate which would allow coins to drop into it, Mr. Sertell opined that "…this…began life as an acknowledged slot machine and it's been modified…" (N.T., 59, 10/18/2013.)

He first used the machine about sixty (60) times to familiarize himself with it. (N.T., 60, 10/18/2013.) He found that the reels advanced at a speed such that he was only able to discern the color of the card that was progressing through the window and was unable to pinpoint the suit or rank. (N.T., 59-60, 10/18/2013.) In his testing of the machine, Mr. Sertell began by attempting to achieve a winning combination using the least valuable symbol because "it's traditional on a slot machine…that the least valuable combination will be the most easy to achieve." (N.T., 61-62, 10/18/2013; See Exhibit C-5.) First, he made twenty (20) attempts to achieve a winning "Jacks or Better" combination, i.e., getting a combination of a Jack, Queen, King, or Ace card, and of those twenty tries, while there were some paying combinations, he did not achieve his desired result of three jacks. (N.T., 62-64, 10/18/2013; See Exhibit C-5.) In his second test, he attempted to get three of a kind, which is the third least valuable paying combination. (N.T., 67, 10/18/2013; See Exhibit C-6.) Out of the twenty (20) attempts he made, he was successful in two tries. (N.T., 68, 10/18/2013.)

Mr. Sertell opined that the Jersey Hold 'Em machine was a game of chance. (N.T., 72, 83-86, 10/18/2013.)

Mr. Sertell went on to describe the fact that these machines differ from those present in a casino because the customer has a choice in manually stopping the reels (by pressing a button) whereas in a casino machine a "random number generator" determines where the machine will stop on each reel and will automatically do so without input from the customer. (N.T., 75-76, 10/18/2013.) Mr. Sertell cannot say for certain whether or not this machine was equipped with a "random number generator," which he defined as a program imbedded in that machine that serves to choose one or numerous random numbers off the 'shelf' as soon as a customer puts credits in a machine." (N.T., 73-74, 82, 10/18/2013.) Furthermore, it was his position that "if the customer were able to choose an outcome and then use the controls of the machine to successfully achieve that outcome, on some quantifiable predictable basis that was more than half…then I would be willing to stipulate…that is a game of skill."[5] (N.T., 85, 10/18/2013.) He obtained this figure from an Alabama Supreme Court case. (N.T., 87-88, 10/18/2013.)

Martin Caplan, owner of the Two Machines, testified that he is the president of Double D Gaming, a company which manufactured the Two Machines and other devices like them. (N.T., 8, 12/18/2013.) Additionally, he is the president of Culinary Services of Delaware, which leases games on a revenue-share basis, and this company leased Two Machines to the VFW in Yardley. (N.T., 9, 12/18/2013.) He has a New Jersey Casino Control Commission license and a slot storage warehouse license. (Id.)

Mr. Caplan explained that, with the aid of a graphic designer, engineer, and a programmer the Two Machines were designed to "meet the legal requirements for the State of

---

[5] Mr. Sertell went on to explain "In other words, the average prudent person should be able to catch whatever target they select more than half the time." (N.T., 87, 10/18/2013.)

Pennsylvania" and "it's impossible to win on either one of these games without a predominant application of skill." (N.T., 10-12, 12/18/2013.) The machines were changed from a Bally device to an International Gaming Technologies (IGT) device (which is a different slot machine company), the reel strips were changed, as well as the programming. (N.T., 12-13, 12/18/2013.) The "random number generator" was wholly taken out of the machines.[6] (N.T., 14-15, 12/18/2013.) Furthermore, the player must hit the respective buttons in order to stop the three reels on both machines. (N.T., 15, 12/18/2013.) Additionally, if all three buttons are not initiated, the machine will not work and the customer will receive his/her money back. (N.T., 18-20, 12/18/2013.) Mr. Caplan tested the Two Machines for a period of six (6) weeks, and during those six weeks in 2008, the Red, White, and Blue machine was played 9,980 times and the "average win percentage" was one-hundred and thirty-two percent (132%). (N.T., 24-25, 12/18/2013.) This percentage was calculated by the amount of currency that was played into the machine and the amount of prizes that were won. (N.T., 25, 12/18/2013.) The payout percentage for the Red, White, and Blue machine for the first three weeks was seventy-nine percent (79%), and for the second three weeks it was forty-seven percent (47%).[7]

The Jersey Hold 'Em machine's difference lies in the fact that the top two cards are automatically chosen by the machine itself, however, the customer still must manually stop each of the bottom three reels or the game is void and his/her money will be returned. (N.T., 32, 12/18/2013.) Mr. Caplan explained that in order to get a winning play, you must get a pair of jacks or better on the top two reels and, thus, the strategy would be to let the machine time out

---

[6] As previously described, a "random number generator's" purpose is to "constantly cycle and select an outcome as soon as [a player] activate[s] the game." (N.T., 14, 12/18/2013.) Thus, as soon as a customer applies currency to activate a game, the "random number generator" determines your outcome. (N.T., 20-21, 12/18/2013.)
[7] Mr. Farley, the defense expert, later explained these calculations in detail, finding that the win percentage is "determined by taking coins out divided by bills in and multiplying that by a hundred...and what that shows you is that physical money inserted...results in wins in excess of that physical money inserted." (N.T., 66-68, 12/18/2013.) Further, in determining how much the American Legion Post made off of these machines, bills in and bills out are relevant. (Id..)

and return a customer's money until they achieve that goal for the top reels. (N.T., 34-35, 12/18/2013.) The cards/symbols on the reels are in a fixed non-sequential order. (N.T., 36, 12/18/2013.) Thus, Mr. Caplan stated that in order to get a paying outcome, it requires focus and concentration. (N.T., 37, 12/18/2013.) On this particular game, during the six (6) week testing period there was a win percentage of two-hundred and seventy percent (270%) whereas the payout percentage was forty-seven percent (47%). (N.T., 40-41, 12/18/2013.) Following the first three (3) week period and upon consideration of the respective payout percentages, both machines were modified from a three-coin to a ten-coin game, resulting in the payout percentages decreasing. (N.T., 27, 44-47, 12/18/2013.)

Next, Mr. Nicola Farley testified for the defense. Mr. Farley has a Bachelor of Engineering Degree in Electrical Engineering and Computer Science from Stevens Institute of Technology. (N.T., 105, 10/18/2013; See Exhibit D-2.) He began his career in 1987 with the New Jersey Division of Gaming Enforcement in Atlantic City, New Jersey, as a test engineer, testing gaming devices. (N.T., 107, 10/18/2013; See Exhibit D-2.) In 1991 he gained full-time employment with Gaming Laboratories International, an independent testing laboratory where he was responsible for inspecting gaming devices in casinos and developing testing procedures for these gaming devices. (N.T., 107, 10/18/2013; See Exhibit D-2.) Since November 2000, he has owned a company known as Nick Farley and Associates, Incorporated, which is engaged in the business of evaluating and examining electronic gaming devices and systems to determine if they are in compliance with the relevant regulations and classification of these devices. (N.T., 105, 10/18/2013; See Exhibit D-2.) The company consists of seven staff members, including engineers, computer scientists, and mathematicians. (N.T., 106, 10/18/2013; See Exhibit D-2.)

Based on the foregoing, we admitted him as an expert in the field of classification of electronic gaming devices. (N.T., 108, 10/18/2013.)

Mr. Farley began his testing of the machines by engaging the operation of the game as if he were a player, in that he inserted currency, pressed the start button, and engaged the stop buttons to stop each of the reels to determine in which instances the machines will time out and return the customers currency. (N.T., 54-55, 12/18/2013.) Next, he examined documentation relating to the configuration of the games. (N.T., 55-56, 12/18/2013.) The game play was videotaped, and Mr. Farley was able to go back and review the video in a frame-by-frame analysis in order to see if there was any "consistency in the stopping of the reels after you press the button." (N.T., 56, 12/18/2013.) Mr. Farley found that the reels stopped consistently within three or four symbols after the stop button was engaged in the Red, White, and Blue machine and within two symbols in the Jersey Hold 'Em game. (N.T., 56, 12/18/2013.) Furthermore, during this functionality testing, Mr. Farley and his employees attempted to "find visual cues on the reels that would get them to stop in consistent locations. And with that, with the videotape analysis, we found that, yes, you can be consistent in your outcome." (N.T., 60-61, 12/18/2013.) Specifically in the Jersey Hold 'Em game, because the first two reels are stopped automatically, the player can only control sixty percent (60%) of the game. (N.T., 74, 12/18/2013.)

Mr. Farley then examined the software source code for the machines, which is "the computer programming language that is written by a software developer that is ultimately compiled and created into the executable program that you see here. It's written in a computer program language." (N.T., 57-58, 12/18/2013.) This analysis revealed that there was no "random number generator" in the source code. (N.T., 59, 12/18/2013.) Based on the foregoing, Mr. Farley opined that the Two Machines are predominantly games of skill. (N.T., 63, 12/18/2013.)

We determined, based on the evidence submitted, aside from their respective aesthetic appearances, there is no substantial difference between the two machines and their similar configurations. On this same date, upon consideration of the evidence submitted by both parties, this Court entered an Order finding that the Two Machines in question were predominantly games of skill rather than chance and, thus, they were not gambling devices subject to seizure pursuant to 18 Pa.C.S. § 5513(a).

On December 31, 2013, the Commonwealth filed a Notice of Appeal to the Superior Court. As a result and by agreement between both parties, we ordered on this same date that the return of the Two Machines was stayed for fourteen (14) days.

On January 6, 2014, the Commonwealth filed a Motion to Stay the return of the Two Machines during the pendency of the Commonwealth's appeal, which we granted on January 8, 2014.

## III.    MATTERS COMPLAINED OF ON APPEAL

On September 31, 2013, the Commonwealth filed its Statement of Matters Complained of on Appeal, raising the following issue, *verbatim*:

1.  The lower court erred as a matter of law and/or a matter of fact in finding that the gaming devices and/or gaming machines in question were predominantly games of skill rather than games of chance where such finding is contradicted by the evidence of record wherein the evidence reflects that a player offers consideration in the form of monies in order to play the gaming devices and/or gaming machines; the outcome is based predominantly on chance and/or "luck" rather than any skill of the player; and a player can be rewarded by a payout of monies.

## IV.    ANALYSIS

The elements of gambling are as follows: "consideration, a result determined by chance rather than skill, and a reward." Commonwealth v. Two Electronic Poker Game Machines, 465

A.2d 973 (Pa.Super. 1983). If these three (3) elements are present, the machine will be considered "so intrinsically connected with gambling" as to constitute a gambling device prohibited under 18 Pa.C.S. §5513(a) *per se*. Commonwealth v. Wintel, Inc., 829 A.2d 753, 758 (Pa.Super. 2003) citing Two Electronic Poker machines, 465 A.2d at 977. The Commonwealth bears the burden of proving the *per se* nature of the machines. Two Electronic Poker Game Machines, 465 A.2d 975. However, because forfeiture proceedings are *in rem*, the Commonwealth bears this burden to prove its case by a preponderance of the evidence. Id. In the instant case, the element of skill versus chance is at issue. The long-held standard regarding this element is...

> "In order to conclude a machine is a gambling device *per se*, it is necessary to find that successful play is entirely a matter of chance as opposed to skill...A peculiar combination of luck and skill is the *sine qua non* of almost all games common to modern life. It is hard to imagine a competition or a contest which does not depend in part on serendipity. It cannot be disputed that football, baseball and golf require substantial skill, training, and finesse, yet the result of each game turns in part upon luck or chance." Two Electronic Poker Game Machines citing Nu-Ken Novelty, Inc. v. Heller, 288 A.2d 919 (Pa.Super. 1972) and In re Wigton, 30 A.2d 352 (1943).

The Superior Court determined, therefore, that the outcome must not be wholly determined by skill in order to find a machine is not a game of chance and thus does not fall within the category of an unlawful gambling device. Two Electronic Poker Game Machines, 465 A.2d at 977. Furthermore, a "showing of a large element of chance, without more, is not sufficient." Id. In Two Electronic Poker Game Machines, the Superior Court was "...left with the task of determining in each case the relative amounts of skill and chance present in the play of each machine and the extent to which skill or chance determines the outcome" in deciding whether a machine, that was not a gambling device *per se*, was nevertheless subject to forfeiture. 465 A.2d at 976-77. The first machine, known as "Electro-Sport," is a coin-operated video game

which utilizes a random number generation program and uses some elements of five card draw poker. Id. at 976. Points are awarded for certain combinations of cards, and "the odds are precisely the same as those in an ordinary game of poker, and can only be changed by replacing the integrated circuitry." Id. The player does not play against the machine, but rather seeks "to maximize his hand" and the awarded points. Id. The Superior Court determined that the Commonwealth presented sufficient evidence to prove that the machine was a gambling device *per se* in that although Appellee demonstrated some skill is involved in the playing of the game, "because chance determines the cards dealt and the cards from which one can draw—in-short, a large random element is always present."[8] Id. at 978. The remaining forfeited machines that were addressed involved elements of reward or knowledge of unlawful use, neither of which are at issue here.

More recently, in 2010 the Superior Court addressed this issue in Commonwealth v. Dent, 922 A.2d 190 (Pa. Super. 2010), in which it was determined that Texas Hold 'Em Poker was a game of chance as opposed to a game of skill. 922 A.2d at 191-92. Defendants were charged with twenty (20) counts of violating 18 Pa.C.S. §§ 5513(a)(2), a(3), and (a)(4). Id. at 191. The trial court, following a hearing on Defendant's *habeas corpus* motion, determined that because skill predominated over chance, Texas Hold 'Em Poker was not unlawful gambling pursuant to the charged statutes. Id. at 192. At the hearing, a Pennsylvania State Trooper testified as to the specifics of the game, which involves paying the dealer to obtain chips, placing bets worth one (1) or two (2) dollars into the "pot," and at the conclusion of the game the winner would receive the pot and would ultimately tip the dealer. Id. at 191.

---

[8] The establishment in which the machines were situated employed an expert who testified that he could win at a rate four and one half (4 ½) times greater while employing his knowledge of statistics; however, he could not say how to apportion the amounts of skill and chance. Id. at 978.

The Court relied on Two Electronic Poker Game Machines, as set forth above, to apply the "predominate-factor test" to be used, which defines that "for a game to constitute gambling, it must be a game where chance predominates rather than skill." 992 A.2d at 193, citing Two Electronic Poker Game Machines, 465 A.2d at 977. Additionally, relying on Two Electronic Poker Game Machines, the Court took special note of following instructions: "in making this determination, the court should determine the relative amount of chance and skill present in the game; and if the element of chance predominates, the game is a gambling game." 992 A.2d at 193, citing Two Electronic Poker Game Machines, 465 A.2d at 978. In applying the "predominate-factor test," the court decided that "while the outcome of poker may be dependent on skill to some degree, it is predominantly a game of chance." 992 A.2d at 196. In other words, although skill may determine the outcome, "players are still subject to defeat at the turn of the cards."[9] Id.

Upon consideration of the expert testimony and that of Mr. Caplan, as well as the actual demonstration of the machines given at the hearing, we found that the Two Machines at issue here are predominantly games of skill as opposed to chance. We therefore concluded that the two machines confiscated by the Pennsylvania State Police are not gambling devices under 18 Pa.C.S. § 5513(a) and, therefore, they were wrongfully confiscated. In conjunction with the results as to the high win percentage and payout percentage following testing of the machines at the relevant establishment for a period of six (6) weeks[10]; the fact that, unlike traditional casino slot machines, these machines only operate if the customer manually

---

[9] See also Liquor Control Board v. Kehler, 538 A.2d 979, 981 (Pa. Cmwlth. 1988) (opining in dicta that poker playing is "unlawful gambling" under the crimes code, because "in order to participate, one must 'ante up' money; the winner is determined by the luck of the cards drawn (and a lot of bluffing); and the winner takes the 'pot.'")
[10] N.T., 24-27, 40-41, 44-47, 12/18/2013.

initiates the stop buttons[11]; neither machine is equipped with a "random number generator" in their source codes, respectively[12]; the order of the symbols/cards on the respective reels, although not sequential, is fixed;[13] and there existed a consistency in how far the reel would continue to travel before it came to a complete stop after the button was initiated[14] led us to this conclusion. There is no dispute that both machines have been modified.[15]

Significantly, we gave great weight to Mr. Farley's testimony that his employees, following familiarization with the machines, were able to locate visual cues on the reels that would give them the ability to stop the machines in consistent locations.[16] Here, with the displacement of the "random number generator," skilled customers have the ability to control the outcome of the game, therefore giving them a greater likelihood for success. These Two Machines differ from that at issue in Two Electronic Poker Game Machines because it utilized a "random number generator" and although the player could express skill in dealing with the cards he/she was dealt, the generator determined those five cards that would be drawn as soon as currency was emitted. 465 A.2d at 976-78. Here, that large random element is not present. Furthermore, the Two Machines at issue in this case differ from Texas Hold 'Em Poker because, again, the customer is dealt random cards face down and has no opportunity to exert any kind of influence as to which cards they receive. Dent, 922 A.2d at 191-93, 196. The Two Machines owned by Mr. Caplan were purposefully modified in order to be in compliance with 18 Pa.C.S. § 5513(a). As such, we determined that the Two

---

[11] N.T., 32, 35, 57, 75-76, 10/28/2013; N.T., 15, 18-20, 12/18/2013.
[12] N.T., 75-76, 10/18/2013; N.T., 14-15, 57-59, 12/18/2013.
[13] N.T., 41-42, 10/18/2013; N.T., 36, 12/18/2013.
[14] N.T., 39-40, 10/18/2013; N.T., 56, 60-61, 12/18/2013.
[15] N.T., 58-59, 75-76, 10/18/2013; N.T., 10-15, 12/18/2013.
[16] N.T., 60-61, 12/18/2013.

Machines, following this significant modification, were no longer endowed with the randomness of their antecedent electronic poker and/or Texas Hold Em' poker games.

## V.    CONCLUSION

The foregoing represents this Court's opinion regarding the Commonwealth's appeal from our December 18, 2013 Order declaring the Two Machines referenced herein to be games of skill and not chance.

BY THE COURT:

Date: *April 2, 2014*

ALBERT J. CEPPARULO, JUDGE